Argued and submitted February 12, affirmed July 22, 2015

Cindy DURETTE,
*Plaintiff-Appellant,*

*v.*

Darcy J. VIRGIL,
*Defendant-Respondent.*

Washington County Circuit Court
C104897CV; A152871

356 P3d 639

Michael H. Bloom argued the cause for appellant. With him on the briefs was Michael H. Bloom, P.C.

Glenn E. Barger argued the cause for respondent. With him on the brief were Westin T. McLean and Barger Law Group PC.

Before Nakamoto, Presiding Judge, and Egan, Judge, and Wilson, Senior Judge.

WILSON, S. J.

## WILSON, S. J.

Plaintiff appeals a judgment in a motor vehicle accident personal injury action resulting in a jury verdict for defendant. She contends that the trial court erred in admitting the testimony of an expert witness who opined—based on his analysis of photographs of, and a repair estimate for, plaintiff's vehicle after the collision—that the collision could not have produced the forces necessary to cause the claimed injuries to plaintiff's neck and back. We conclude that the evidence was relevant and that the record was sufficient to show the validity of the expert's methodology. We further conclude that the witness was qualified to render the opinions that he gave. Finally, we conclude that other evidence presented to the jury after the OEC 104 hearing at which the trial court made its evidentiary ruling did not affect the admissibility of the expert's testimony. Plaintiff also assigns error to the trial court's denial of her motion for a new trial on the ground that the court erred in admitting the expert's testimony. That error is not reviewable because it is based on alleged errors committed during trial. Accordingly, we affirm.

## I.   FACTS

On August 14, 2008, plaintiff was stopped at a stoplight when defendant rear-ended her car. Plaintiff did not have any head, neck or back pain on the day of the collision. She went forward with her plans to drive to Lincoln City the following day to spend a week vacationing with her father. By the day after the collision, plaintiff began to experience pain in her neck and upper back. When the pain did not subside, she cut her vacation short and returned home to begin chiropractic treatment. Plaintiff received chiropractic care for headaches, neck pain, pain down her right arm, blurred vision, and balance problems.

Plaintiff had experienced back and neck pain for which she had received treatment off and on since the early 1990's. She had been in another collision in 2004 in which her car had been struck from the side at the rear. She had been symptom free for about eight months before the August 14, 2008, collision.

Defendant admitted that she was negligent in causing the collision. The only issue tried to the jury was plaintiff's noneconomic damages, for which she sought $7,500. The first question on the verdict form was: "Was the defendant's negligence a substantial factor in causing injury to plaintiff?" The jury answered unanimously, "no."

Plaintiff had moved *in limine* to exclude the testimony of defendant's expert, Bradley Probst, raising several grounds for her objection. First, she argued that because Probst is not licensed as an engineer in the State of Oregon, it would be a crime for him to testify about his analysis and opinions. Second, plaintiff argued that Probst was not qualified to opine that the forces in the collision could not have caused her injury. She did not assert that Probst lacked qualifications as a biomechanical engineer. Rather, plaintiff's counsel explained:

> "The challenge will be not as much to the qualifications of a biomechanical engineer, because there really is no degree or certification for such a thing. The challenge is to an expert, who is not a medical expert and has no training in medicine except a couple classes in anatomy and neurophysiology, can say, let alone any expert, that a force did not injure a person in a particular motor vehicle collision."

Third, plaintiff contended that, even if Probst was qualified to reach such an opinion, he lacked a foundation for doing so when he relied only on photographs of the damage to plaintiff's car and, perhaps, on plaintiff's testimony about the damage to her car and the repairs performed.

At plaintiff's request, the trial court conducted an OEC 104 hearing outside the presence of the jury.[1] In that hearing, Probst described his education, which included a Bachelor of Science in mechanical engineering, a Master of Science in biomedical engineering, and all work for a Ph.D. in biomedical engineering except defense of his thesis. Probst testified that, as part of his course work, he took courses in anatomy, physiology, and neurophysiology with medical students at Tulane Medical School. He also took courses in

---

[1] Pursuant to OEC 104(1), "[p]reliminary questions concerning the qualification of a person to be a witness * * * or the admissibility of evidence shall be determined by the court * * *."

bone mechanics, orthopedic biomechanics, human tissue, tissue engineering, material science, and other biomedical engineering courses at the Tulane engineering school. Probst testified that, throughout his career, he has "worked and trained and mentored under licensed medical doctors as well."

Probst testified at some length about the field of biomedical engineering:

"I guess I need to define what a biomedical engineer is. It seems like there's always a very large misconception of what a biomedical engineer is, what I'm actually doing. I'm not diagnosing an injury. That's stating whether an injury does or does not exist. I'm taking at face value what the medical records show, and what I'm doing is an engineering analysis. I'm performing, in essence, structural engineering on the human body. So I'm not performing a medical diagnosis. I'm strictly performing *** biomedical engineering analyses on the human body.

"So I'm treating the human body as a mechanical structure, applying engineering techniques, material science techniques, laws of physics, science and engineering to understand how a material responds to a force. That's engineering. An engineer can look at a material, put a force on it and understand how it responds. It's very common that engineers apply this to living materials or biologic materials. We can understand how wood reacts to a force. Wood was a living material at one point in time. Sometimes we still use it. There's treehouses and various things like that. So engineers can understand how a material responds to a force.

"So my background, obviously the mechanical engineering aspect, allows me to understand the material *** values of these vehicles and how those materials respond to force and how crush occurs or how damage or how some type of failure occurs to the vehicle.

"Once we know what's occurring to the vehicle, we can understand how that occupant is going to respond, again, based upon the laws of science, physics and engineering, and we can also confirm this through scientific studies and peer-reviewed publications. We look how the occupants respond, and again we look to see what kind of forces are placed on these objects, if you will, or this material, how

does that material respond? Does that material fail? And we're simply saying whether or not something can or cannot occur based upon the laws of physics."

Probst described his methodology in analyzing whether a particular collision could have produced the injuries claimed:

"[W]e do use, again, accepted methodologies. These are peer-reviewed, published, scientifically accepted methodologies of how [to] perform what is known as a biomedical injury assessment analysis. Again, we're looking at the causal relationship, not whether an actual injury does exist. We're looking to see if an event can cause an outcome, if you will. So we use these accepted techniques. Again, we're looking at the severity of the incident, the direction of impact, things of that nature, to understand how the vehicle would respond.

"Then we look at specific information about this individual: how they were seated, their height, their weight, their—the type of seat that was in the vehicle, their restraints, and we're going to understand how they move in response.

"Once we know how they move in response, then we can understand what kind of forces are actually placed on individual joints and individual tissues. We can compare that to not only known human tolerance values of when failure occurs, but we can look at this unique individual. We know information about this individual, about what they can and cannot do, what their body can withstand, what their personal values, tolerance values are. So we can compare * * * what they can do to the forces involved in this event to see, did this reach a threshold where some type of material damage could occur.

"Then, as a final step, we look, again, just like any type of study where we're using the scientific method, we look for external validation. So we've analyzed this specific case. Now we go out and look to see what else is out there in the world that has been published, that has been tested to see if other researchers arrive at the same types of conclusions that we have arrived at."

Probst acknowledged that he is not licensed as a physician and is not qualified to prescribe or give advice

about treatment for injuries.[2] He declined, however, to concede that he was not "qualified to render diagnoses for people that have been injured in a collision":

"No, that's not correct. Again, part of what biomedical engineers do is research. Any car you drive has to be tested to make sure it is safe to actually be road-worthy. Biomedical engineers work on that, set the standards, understand, again, this material science of when does failure occur.

"And so part of that research, we do tests. We conduct tests. We want you to understand what is actually occurring. So we might place * * * a crash test dummy in a car and crash it. You have to understand the results. If we use live, human subjects, we have to understand the results as well.

"Well, if you're looking at the results, that, in essence, is making a diagnosis. Did something occur? It's simply semantics. We're looking at, again, did some type of failure occur to this tissue of the human body? You could call it a diagnostic, but it's research. It's an analysis of a process of what is occurring."

Plaintiff's counsel confronted Probst about his qualifications to opine whether the force in a collision was sufficient to cause injury: "Because you can determine what force is necessary to damage the human body, you're qualified to determine whether force was sufficient to cause an injury; is that fair?" To which Probst responded:

"Well, an injury is mechanical failure of biologic tissue. That's simply what it is. If you have a broken bone, that's hard tissue that has failed. There is now some disconnect to that hard tissue. So in order for that material to fail, it has to have gone beyond its ultimate strength. So, yes, I do know enough to say, here is [*sic*] the material properties of this tissue and when failure, material failure does or does not occur.

"* * * * *

"You could call it an injury if you wish, but it's material failure that I'm speaking about."

---

[2] In his testimony before the jury, Probst conceded more on that point. When asked, "You're not a physician? You're not licensed to treat patients or examine patients or give patients diagnoses; is that correct?" He answered, "Correct."

Before the OEC 104 hearing, the trial court had expressed skepticism about whether Probst could be qualified to rule out the collision as a cause of plaintiff's alleged injuries. At the conclusion of the hearing, however, the trial court ruled that Probst's testimony was admissible:

"The Court finds that this is scientifically based and he has the qualifications to render an opinion in this particular area regarding essentially the force that occurred and whether or not that force would be enough to cause certain failures within the body, and in this particular case, given the information he has, to render an opinion regarding whether or not that force could cause the failures that was [*sic*] diagnosed by [plaintiff's] own doctor."

The trial court also rejected plaintiff's argument that Probst could not give an admissible opinion about the forces in the collision based only on photographs of plaintiff's car, repair estimates, and plaintiff's testimony about the damage, without examining plaintiff's car or considering the damage to defendant's car. The trial court ruled that those matters went to the weight to be given Probst's testimony and were proper subjects for cross-examination.

Probst then explained his methodology and conclusions to the jury. He explained his "energy-based crush analysis," and his conclusion that defendant's car struck plaintiff's car at "significantly below ten miles per hour" based on the only damage to plaintiff's car being scuff or scratch marks on the bumper cover. Probst testified that he then calculated "the acceleration of the event" as a maximum of three Gs, or units of gravity. He testified that, if the collision occurred at five miles per hour, the acceleration would be 1.5 Gs. Probst compared those forces to the forces a driver experiences in hard braking situations and told the jury "it's very close, if not less than what you'd see if you hit a pothole or a speed bump or go over a curb or something like that. That's the type of force we're talking about."

Probst explained to the jury that he had used plaintiff's deposition testimony and information from the medical records to determine her height, weight, and how she was situated in the car at the time of the collision, and measurements from an exemplar vehicle to gather information about

the seat and head restraint. From this data, he calculated that the head restraint was "more than sufficient *** to restrain the entire head and neck from moving rearwards." He further concluded that the subsequent forward movement was "no different than if you stop the car in a normal manner, if your foot's on the brake *** coming to a stop sign or anything like that." In Probst's opinion, the collision did not produce enough force on plaintiff's body to cause the movement necessary to stretch her tissues sufficiently to cause a sprain or strain.

As the final part of his analysis, Probst told the jury that he had looked at information in plaintiff's medical records and testimony to determine her preexisting condition and tolerance for various activities.

"[T]hat allows us, again, to do an engineering analysis to say, let's see how much force that would place on her body, compare that to this event to see if, you know, those levels of force are greater than this one, we know she can personally withstand this. And again, we also compare that to other published literature that shows the same thing, that the human body is much stronger and can easily withstand an event like this."

Probst's direct testimony ended with his conclusion that "there's just simply not an injury mechanism to produce a sprain or strain, an excessive stretching of soft tissue to cause failure of that tissue."

On cross-examination, Probst conceded that, if plaintiff's car had sustained crush damage in the collision and not just the scuffing of the bumper cover, the likelihood of a mechanism for injury would have been greater. He also explained that, although he saw references in plaintiff's medical records to prior complaints of pain and treatment, he saw no "objective information" that her spine was weak.

Plaintiff's treating chiropractor testified that plaintiff was injured in the collision.[3] Plaintiff also called as a

---

[3] That testimony was perpetuated before trial and the video was played to the jury.

witness Keith Cronrath, a mechanical engineer. Cronrath testified that, more than three years after the collision at issue in the trial, he had examined plaintiff's car, including removing the bumper cover, and determined that there was damage not visible in photographs of the car with the bumper cover on.[4]

Plaintiff's counsel asked Cronrath about the appropriateness of using photographs to determine whether a vehicle was damaged:

"Q.   Is that a fair way to determine the damage with regard to this vehicle?

"A.   It's * * * a way that is sometimes used, but you run the risk of not seeing damage that may be underneath the cover."

Cronrath found the bumper reinforcement bent down and twisted. He found that one side of the bumper was lower than the other. Cronrath also testified that the trailer hitch receiver mounted on plaintiff's car would have been struck first in a rear-end collision and that that would have interfered with the functioning of the styrofoam impact absorber. He explained:

"What it's going to do is take away some of the softening of that impact, so it's going to make it a more—for any given impact speed, it's going to make it a more rigid and more harsh type of impact."[5]

Defendant called Junaid Michael Burke, a chiropractor, as a witness. Burke reviewed plaintiff's medical

---

[4] Cronrath testified that the 2004 collision had been a T-bone and could not have produced damage to the rear bumper. Defense counsel cross-examined plaintiff about where the impact had been in 2004 and showed plaintiff a drawing that plaintiff had made at her first treatment appointment for her injuries in that collision. That drawing appeared to show the impact to the rear of plaintiff's car. Plaintiff explained:

"For the truth, I'm not sure how she actually—where [the other driver] was in position to me. I just know I got hit. I know how my car was and that she * * * was going to be turning in behind me to go in the same direction I was. So to honestly say, I don't know the exact position where she was, but I know that she * * * hit the right side. And I tried to do the diagram as best possible. I was not rear-ended from her."

[5] Cronrath was not asked, and he did not offer an opinion, about the speed at which plaintiff's car was struck at impact.

records and also examined her.[6] Burke concluded that plaintiff did not sustain any "new injuries" in the 2008 collision. He also concluded, however, that the collision had caused a "flare-up" of plaintiff's prior problems, including those from the 2004 collision and from an accident in which she flipped an ATV.[7] Burke testified that the "flare-up" resulted in some pain and restriction of movement and that, in his opinion, "three-plus" months of chiropractic treatment were reasonable and necessary.

Burke distinguished a "flare-up" or "exacerbation" from an "aggravation" of prior injuries:

> "Let me make my terms very clear. When I say exacerbate, the definition of that means it's a flare-up. The symptoms are worse, but the underlying tissues are not damaged further; whereas, an aggravation is a material worsening. It further damages tissue. Or a new injury would be injuring additional tissue or reinjuring tissue that's already been injured. And again, I don't think any of that happened. She had an exacerbation, a symptomatic flare-up."[8]

## II.   ANALYSIS

### A.   *Admissibility of Probst's testimony*

Plaintiff's first assignment of error is that the trial court erred in denying her motion *in limine* to prevent Probst from testifying that the collision could not have caused plaintiff's alleged injuries. We review the trial court's ruling

---

[6] Burke also looked at photographs of the damage to plaintiff's car and the repair estimate because "[t]hat gives me a better idea as to the force of the impact." He testified that, when he treated patients, he generally liked to see photographs and repair estimates.

[7] Plaintiff explained that she "bailed" from the ATV before it flipped over and that she was not pinned under it.

[8] The trial court instructed the jury without objection:

"If you find that the plaintiff had a bodily condition that predisposed her to be more subject *** to injury than a person in normal health, nevertheless, the defendant would be liable for any and all injuries and damage that may have been suffered by the plaintiff as a result of the negligence of the defendant, even though those injuries, due to the prior condition, may have been greater than those that would have been suffered by another person under the same circumstances."

It is not clear from the verdict whether the jurors thought that, to recover for "injuries," plaintiff had to prove that her tissues were damaged, and not merely that her prior symptoms were exacerbated.

for errors of law, insofar as it turns on questions of relevance under OEC 401, as well as a witness's qualifications to testify as an expert and scientific validity under OEC 702. *State v. Rogers*, 330 Or 282, 311-12, 4 P3d 1261 (2000) (relevance rulings are reviewed for errors of law); *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299, 14 P3d 596 (2000) (rulings on the validity of scientific evidence are reviewed for errors of law). We conclude that the trial court did not err in admitting Probst's testimony.

### 1. *OEC 702 scientific validity*

In an opinion also decided this date, we held that the type of biomechanical or biomedical analysis undertaken by Probst, including his reliance on photographs and other evidence of vehicle damage without a personal inspection, is scientifically valid for purposes of OEC 702. *Thoens v. Safeco Ins. Co. of Oregon*, 272 Or App 512, 543, 356 P3d 91 (2015). The record at trial on the issue of scientific validity was more fully developed in *Thoens* than in this case. Different arguments are raised here, however, concerning relevance under OEC 401, expert witness qualification under OEC 702, and the balancing of unfair prejudice against probative value under OEC 403. We address those separate arguments here.

### 2. *OEC 401 relevance*

OEC 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Plaintiff argues on appeal that Probst's testimony is not relevant because it is based on crash testing. She cites *Dyer v. R. E. Chirstiansen Trucking, Inc.*, 318 Or 391, 868 P2d 1325 (1994), for the proposition that, "[u]nder Oregon law, for any test to be relevant to prove an issue in a case, the test must be 'conducted under conditions that were the same or substantially similar to the circumstances being litigated in this case.'" (Quoting *Dyer*, 318 Or at 400.) She contends that "defendant failed to establish anything that would lead a court to believe that the tests that Probst relied upon in arriving at his opinion were performed under similar 'enough conditions and circumstances [to] those that

are being litigated' to be logically relevant." Plaintiff argues that, under the *Dyer* standard, it would be impossible to design a test that would show whether or not a particular person was injured in a particular collision. Even if every facet of the 2008 collision was duplicated in a test, including using plaintiff herself as the driver, plaintiff contends that it would not be logically relevant because "[h]ow a human body responds to trauma, even if it is the same body, varies from moment to moment depending on numerous variables."

Plaintiff's reliance on *Dyer* is misplaced. *Dyer* was a personal injury case in which the plaintiff was injured in a collision with defendant's vehicle, a tractor pulling a full-length trailer and a shorter "pup" trailer. Plaintiff's theory was that the pup trailer had gone into plaintiff's lane of travel as it rounded a curve. She sought to play to the jury a videotape showing an exemplar tractor-trailer negotiating a right turn on wet pavement in order to provide a visual illustration of how a trailer can "sweep" into the oncoming lane as it turns. The trial court excluded the videotape on the grounds that the conditions depicted were too dissimilar from the conditions at the time of the collision in which plaintiff was injured.[9] The Oregon Supreme Court affirmed the trial court: "The trial court was entitled to conclude, based on the factors described, that the conditions depicted in the videotape were so dissimilar as to render the videotape irrelevant under OEC 401." *Dyer*, 318 Or at 401.

*Dyer* involved re-creation evidence. Here, Probst did not purport to re-create the 2008 collision, nor did he suggest that any of the crash test data on which he relied purported to be such a re-creation. Probst's analysis indeed relied in part on crash test data, but under OEC 703,[10] that

---

[9] "[P]laintiff's expert, who made the videotape, testified that the videotape depicted a longer pup trailer than the one that defendants' tractor was pulling and that the videotaped road had a dissimilar surface composition, a dissimilar coefficient of friction, and a dissimilar slope; and plaintiff's expert testified that the driver of the videotaped tractor-trailer combination applied his brakes in the curve, whereas [defendant's driver] testified without contradiction that he had not done so."

*Dyer*, 318 Or at 401.

[10] OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert

data did not need to be independently admissible. Probst testified that his analysis used "accepted methodologies" and "accepted techniques," including the use of crash test data. That testimony, which was unrebutted, was sufficient to establish that experts in Probst's field reasonably rely on data of this type in forming their opinions. It is not necessary that the crash tests be designed or conducted to determine whether a particular individual would be injured in a particular collision. It is sufficient if the data from those tests is reasonably used by biomechanical or biomedical experts to perform a "biomedical injury assessment analysis."

The appropriate OEC 401 relevance here is whether Probst's opinions had a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. If the jury believed Probst's conclusion that the forces in the collision were insufficient to damage plaintiff's joints and tissues, then it was less probable that the collision had caused the injuries she alleged. Therefore, it was relevant.

### 3. *Probst's qualifications*

OEC 702 requires that a witness be qualified before he or she may give scientific evidence.[11] Plaintiff makes two arguments that Probst lacked qualifications to offer his opinion at trial. The first is that Probst is not a licensed engineer in Oregon and is therefore precluded from testifying by ORS 672.020. Plaintiff's second argument is that Probst's opinion is a medical diagnosis, and that he lacks the necessary medical qualifications to make such a diagnosis.

### a. Lack of an Oregon engineering license

Plaintiff argued at trial that ORS 672.020(1) and ORS 672.005(1) prohibited Probst from testifying because

---

at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[11] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

he is not licensed as an engineer in Oregon. ORS 672.020(1) provides:

"In order to safeguard life, health and property, no person shall practice or offer to practice engineering in this state unless the person is registered and has a valid certificate to practice engineering issued under ORS 672.002 to 672.325."

ORS 672.005(1) defines the practice of engineering:

"'Practice of engineering' or 'practice of professional engineering' means doing any of the following:

"(a) Performing any professional service or creative work requiring engineering education, training and experience.

"(b) Applying special knowledge of the mathematical, physical and engineering sciences to such professional services or creative work as consultation, investigation, *testimony*, evaluation, planning, design and services during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and design, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works or projects."

(Emphasis added.)

The practice of engineering is further defined in ORS 672.007:

"For purposes of ORS 672.002 to 672.325:

"(1) A person is practicing or offering to practice engineering if the person:

"(a) By verbal claim, sign, advertisement, letterhead, card or in any other way implies that the person is or purports to be a registered professional engineer;

"(b) Through the use of some other title implies that the person is an engineer or a registered professional engineer; or

"(c) Purports to be able to perform, or who does perform, any service or work that is defined by ORS 672.005 as the practice of engineering."

The trial court rejected plaintiff's interpretation of the statutes and her contention that, in doing his analysis or offering testimony, Probst was practicing engineering:

> "[W]hat that statute [ORS 672.005(1)(b)] is trying to prevent is people who are not licensed in Oregon to help or assist others, including with testimony, because testimony could be in the way of, in * * * front of different sorts of governmental bodies, of giving them expert opinion where they're going to build something or do something that might harm the public as a result of that.

> "That statute doesn't apply with what this expert's going to be testifying to here today."

The trial court reached its conclusion without the benefit of our opinion in *Topaz v. Board of Examiners for Engineering*, 255 Or App 138, 297 P3d 498, *rev den*, 353 Or 714 (2013), issued eight months after this trial. In *Topaz*, the petitioner sent a letter to the Oregon Board of Examiners for Engineering and Land Surveying (board) complaining that the engineering department of the City of St. Helens had caused water damage to his home in connection with its sewer rehabilitation project. His letter contained detailed statistical analysis, maps, and proposed engineering solutions. Petitioner signed the letter with the letters "P.E." (which stands for "professional engineer") following his name and testified that he sent the letter "in hopes that it might be easier to receive a response with some action from [the board] if they determined that he had some professional training and knowledge relating to the issues in question." *Id*. at 141-42 (brackets in orginial). Although the petitioner had previously been licensed in Maryland, at the time he sent the letter he was not licensed as an engineer in Oregon or any other state. The board responded to the petitioner's letter by proposing to fine him, alleging that the "petitioner's act of signing the complaint letter with the designation P.E. constituted the practice of engineering, in violation of ORS 672.007(1)(a) and (c) and ORS 672.045(2)—statutes defining and prohibiting falsely representing the authority to practice engineering." *Topaz*, 255 Or App at 141. The board ultimately imposed a $350 civil penalty and the petitioner appealed. We affirmed.

We noted in *Topaz* that ORS 672.045 prohibits a person from "falsely represent[ing]" that the person is a registered engineer. *Id.* at 146. We also held that, in using the letters P.E., the petitioner was practicing engineering because he "purported that he could perform engineering work, such as evaluating the City of St. Helens's sewer system." *Id.* at 147. We also rejected the petitioner's arguments that "his conduct fell within two statutory exceptions for engineering exclusively on his own property and for engineering that is not offered directly to the public" under ORS 672.060(5) and (6). *Id.* We concluded that sending the letter complaining about the City of St. Helens agency took the petitioner's work beyond his own property and sending it to the board directed it to the public. *Id.*

Although our analysis in *Topaz* suggests that the trial court's reading of the engineering licensing statutes was unduly narrow, that does not end the inquiry. The question before us is not whether Probst was engaged in the practice of engineering in Oregon without a license in violation of ORS 672.020 when he did his analysis for defendant or testified at the trial. Rather, the question we must answer is whether a violation of that statute (if there was one) required an evidentiary ruling barring Probst from testifying. We conclude that we need not determine whether Probst's work or testimony was the practice of engineering because, even if it was, ORS 672.020 is a regulatory statute, not an evidentiary one.

As seen in *Topaz*, the Oregon Board of Examiners for Engineering and Land Surveying is empowered by ORS 672.325 to impose civil penalties on those who violate the engineering licensing statutes. The board is also empowered by ORS 672.215 to initiate an action for an injunction in the appropriate circuit court to restrain the activity or proposed activity if it "decides that a person has engaged, or is about to engage, in any activity that is or will be a violation of ORS 672.002 to 672.325."

As we noted in *Holbrook v. Precision Helicopters, Inc.*, 162 Or App 538, 542, 986 P2d 646, *rev den*, 329 Or 527 (1999), "the legislature knows how to provide for evidentiary limitations when it intends them." If the legislature

intended to make inadmissible in court testimony on engineering matters from a witness not licensed as an engineer in Oregon, it could have said so. The trial court did not err in finding Probst qualified to testify despite his not being a licensed engineer in Oregon.

### b. Lack of medical expertise

The second ground on which plaintiff contends that Probst was unqualified to testify is a lack of medical expertise. Plaintiff argues that Probst's opinion amounts to a differential diagnosis ruling out the collision as a cause of plaintiff's injury. She relies on *Barrett v. Coast Range Plywood*, 294 Or 641, 646, 661 P2d 926 (1983), for the proposition that expert medical testimony is required on the question of a causal connection between accident and injury. We reject that argument as applied to Probst's testimony without further discussion for the reasons set forth in *Thoens*. 272 Or App at 544.

## B. *OEC 403 balancing*

Even when scientific or expert evidence is relevant and valid, and the witness who offers it is qualified to do so, the evidence may be excluded under OEC 403 if its probative value is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *State v. Southard*, 347 Or 127, 139, 218 P3d 104 (2009); *State v. Brown*, 297 Or 404, 438-39, 687 P2d 751 (1984). We ordinarily review a trial court's ruling under OEC 403 for abuse of discretion. *State v. Barone*, 328 Or 68, 88, 969 P2d 1013 (1998). Nevertheless, in the context of the admissibility of scientific evidence, we make our own determination of admissibility, including OEC 403 balancing. *Brown*, 297 Or at 442 ("Notwithstanding the usual deference to trial court discretion, we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code.").

Plaintiff objected to the admissibility of Probst's testimony under OEC 403 in her written motion *in limine*, but made no mention of that ground in the OEC 104 hearing or at any other time during the trial. Because the trial court

ruled that Probst's testimony was admissible, we infer that it exercised its discretion and concluded that the probative value of the evidence was not substantially outweighed by any of the dangers enumerated in OEC 403.

Plaintiff had the burden of establishing the inadmissibility of the evidence in the OEC 403 analysis:

> "Relevant evidence may be excluded under OEC 403 only if its persuasive force is substantially outweighed by any of the articulated dangers or considerations alone or in combination. *State v. Johanesen*, 319 Or 128, 136, 873 P2d 1065 (1994). 'This requires that the probative value of the evidence be compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons "substantially outweigh" the probative value.' *Id*. OEC 403 generally favors admissibility, while concomitantly providing the means of excluding distracting evidence from the trial. *Id*. The 'substantially outweighed' phrasing in OEC 403, in effect, places the burden on the party seeking exclusion of the evidence."

*State v. O'Key*, 321 Or 285, 319-20, 899 P2d 663 (1995) (footnote omitted).

On appeal, plaintiff relies on the "unfair prejudice" prong of OEC 403. She contends that the probative value of Probst's opinions is slight, but the danger of unfair prejudice is great because Probst purports to base his opinions on the "laws of science, physics and engineering."

> "In the context of OEC 403, 'unfair prejudice' does not mean 'evidence is harmful to the opponent's case—a central reason for offering evidence.' Rather, it means an undue tendency to suggest a decision on an improper basis, commonly although not always, an emotional one. 'Unfair prejudice' describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish the fact of consequence."

*O'Key*, 321 Or at 321 (internal citations omitted). Plaintiff relies on the Oregon Supreme Court's analysis in *Southard*, noting that, in that case, like this one, the evidence came from a "credentialed expert, surrounded with the hallmarks of the scientific method," and thereby created the

"risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.'" 347 Or at 140-41 (quoting *Brown*, 297 Or at 439). In *Southard*, the defendant was charged with sodomy against two children. The state called as a witness the physician who had examined the children. Although there were no physical findings on the examination to corroborate the allegations of abuse,[12] the physician diagnosed child sexual abuse of one of the children and presented that diagnosis to the jury.

The court concluded that the diagnosis was relevant under OEC 401 and scientifically valid under OEC 702. It nevertheless concluded that the diagnosis should have been excluded under OEC 403 because it hinged on the physician's determination that the child had truthfully reported the sexual abuse. "Because the doctor's diagnosis in this case did not tell the jury anything that it was not equally capable of determining, the marginal value of the diagnosis was slight." *Southard*, 347 Or at 140. The court in *Southard* relied on *Brown*, a case that involved the admissibility of polygraph evidence. The court concluded that polygraph evidence was scientifically valid, but should be excluded because of the danger that the jury would abdicate its traditional role of determining credibility.[13] *Brown*, 297 Or at 439-40. In contrast to the diagnosis in *Southard* and the polygraph result in *Brown*, Probst's testimony here did not suggest to the jury that any witness was or was not being truthful. His opinion was that the forces in this particular collision could not have caused damage to the tissues of plaintiff's neck and back. Unlike an assessment of credibility, the analysis done by Probst of the speed with which plaintiff's car was struck, the energy that the collision transmitted to plaintiff's body, the forces applied to her joints and tissues, and how those forces compared with those experienced by plaintiff or others without injury are not matters the jury was "equally capable of determining." *Southard*, 347 Or at 140.

---

[12] Another physician testified that absence of physical findings was not uncommon given the nature of the alleged abuse. *Southard*, 347 Or at 131.

[13] The court in *Brown* was also concerned about the potential for undue delay if polygraphs were sought of many potential witnesses, and the risk of a "time-consuming and confusing battle of polygraph experts." 297 Or at 441.

Plaintiff also argues that the potential for unfair prejudice from Probst's testimony was especially high because it was not "offered to support an existing medical opinion," but rather to "contradict undisputed medical evidence" that plaintiff's injuries were caused by the collision. Probst's testimony was, however, consistent with Burke's opinion that plaintiff's tissues were not damaged further or reinjured in the collision.

We conclude that plaintiff did not establish that the probative value of Probst's testimony was substantially outweighed by unfair prejudice. The trial court did not err in denying the motion to exclude it under OEC 403.

C.   *The motion for a new trial*

In plaintiff's motion for a new trial, she argued that the trial court committed legal error in admitting Probst's testimony. In addition to the grounds raised in the motion *in limine,* plaintiff contended that it was error to allow Probst to testify as he did when defendant's only medical expert (Burke) testified that plaintiff had suffered an exacerbation of prior injuries in the collision. Plaintiff also points out that, after the motion *in limine,* she presented the testimony of a mechanical and metallurgical engineer who inspected her car and testified to damage that Probst was unable to see in the photographs that he examined.

Defendant argues that the denial of the motion for a new trial is not reviewable on appeal because it is based on alleged errors committed during trial. *Sansone v. Garvey, Schubert & Barer,* 188 Or App 206, 226-27, 71 P3d 124, *rev den,* 336 Or 16 (2003). We agree. Probst's testimony was admissible if it met the standards for scientific evidence in Oregon courts. That analysis is not affected by conflicting testimony of other witnesses, whether called by the plaintiff or the defense after the OEC 104 hearing. If the threshold of admissibility for scientific evidence has been met, other evidence that conflicts with it or undermines the assumptions on which the expert's opinions were based will be weighed by the jury.

As we explained in *Kennedy v. Eden Advanced Pest Technologies,* 222 Or App 431, 452, 193 P3d 1030 (2008):

"When qualified experts disagree about the validity of medical diagnoses or other scientific evidence, judges are in no better position to resolve that dispute than are juries. Rather, the usual techniques for truthfinding—cross-examination, presentation of contrary evidence, and instruction on the burden of proof—should be applied. In Oregon, we trust juries to be able to find the truth in the classic 'battle of the experts.'"

Affirmed.