Submitted April 29, 2020, affirmed March 23, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHARLES ANTHONY LONGJAW,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR74203; A168390

508 P3d 27

Defendant was convicted of murder for stabbing a person outside a Portland hotel. On appeal, he raises two assignments of error. First, he argues that the court erred in admitting a statement he made about DNA evidence on the ground that it was a product of unlawful interrogation. Second, he argues that the trial court erred in admitting testimony that resulted from a juror's question. During the trial, the court allowed the jury to craft questions for the witnesses, which jurors then passed to the court to be read. One of the questions, which a juror wanted to ask a detective, was whether defendant had been willing to incriminate himself by providing DNA evidence: "Did [defendant] give his DNA standard willingly?" The court asked that question, and the officer answered, "No." On appeal, defendant argues that the trial court plainly erred in asking that patently unconstitutional question on behalf of the jury and admitting the detective's response. *Held*: With regard to defendant's first assignment, the Court of Appeals concluded that his statement about DNA evidence was unprompted and not the product of any action on the part of police that was reasonably likely to have elicited an incriminating response. With regard to the second assignment, the court agreed with defendant that the trial court committed plain error, and one that was a textbook example of the risks that a court runs in allowing the jury to act as an examining body rather than a listening and deliberative body. The court explained that, in almost any other circumstance, the error would have resulted in a reversal of defendant's conviction. However, under the unusual circumstances of the case—in which defendant was caught on the hotel's security camera committing the murder, and eyewitness testimony and DNA evidence confirmed what was obvious from that video footage—the court declined to exercise its discretion to correct the court's mistake in allowing the officer to comment on defendant's invocation of his constitutional right not to incriminate himself.

Affirmed.

Cheryl A. Albrecht, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Mary M. Reese, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Michael A. Casper, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

Defendant was convicted of murder for stabbing a person outside a Portland hotel. The hotel's security cameras recorded the stabbing, and defendant was arrested the following day. While in police custody, defendant made a statement to the effect, "Too bad it rained too hard that night and washed away all the DNA evidence." That was not entirely true. Police obtained a warrant for defendant's DNA standard, and it linked defendant to the jacket in which the murder weapon was found.

On appeal, defendant raises two assignments of error. First, he argues that the court erred in admitting his statement about DNA evidence being washed away, because it was the product of unlawful interrogation. We are not persuaded by that contention. Having reviewed the record, we agree with the trial court's conclusion that defendant's statement was unprompted and not the product of any action on the part of police that was reasonably likely to have elicited an incriminating response. *See Rhode Island v. Innis*, 446 US 291, 303, 100 S Ct 1682, 64 L Ed 2d 297 (1980) (holding that the defendant, who was "suddenly *** moved to make a self-incriminating response," had failed to establish that he was "subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him"); *State v. Vondehn*, 348 Or 462, 489 n 3, 236 P3d 691 (2010) ("'Interrogation,' both for federal and state law purposes, is express questioning, as well as words or actions on the part of police (other than those normally attendant to arrest and custody), that the police should know are reasonably likely to produce an incriminating response, whether inculpatory or exculpatory. *State v. Scott*, 343 Or 195, 202, 166 P3d 528 (2007) (adopting test from *Rhode Island v. Innis*, 446 US 291, 301, 301 n 5, 100 S Ct 1682, 64 L Ed 2d 297 (1980)).").

Defendant's second assignment of error presents the more troubling issue and requires more discussion. During the trial, the court allowed the jury to craft questions for the witnesses, which jurors then passed to the court to be read. One of the questions, which a juror wanted to ask a detective, was whether defendant had been willing to incriminate

himself by providing DNA evidence: "Did [defendant] give his DNA standard willingly?" The court asked that question, and the officer answered, "No." On appeal, defendant argues that the trial court plainly erred in asking that patently unconstitutional question on behalf of the juror and admitting the detective's response.

As explained below, we agree with defendant that the court committed plain error, and one that is a textbook example of the risks that a court runs in allowing the jury to act as an examining body rather than a listening and deliberative body. *See Morrison v. State*, 845 SW2d 882, 886-87 (Tex Crim App 1992) ("The practice of juror questioning of witnesses is most disturbing in its potential for undermining these mainstays of the adversary process. *** To allow active juror participation in the presentation of evidence encourages jurors to depart from their role as passive listeners and assume an active adversarial or inquisitorial stance."). In almost any other circumstance, the court's error would result in reversal of defendant's conviction. It is only because of the unusual circumstances of this case—in which defendant was literally caught on camera committing the murder, and eyewitness testimony and DNA evidence confirmed what was obvious from that video footage—that we decline to exercise our discretion to correct the court's egregious mistake in allowing the officer to comment on defendant's invocation of his constitutional right not to incriminate himself.

To frame our discussion, we begin with a brief overview of the factual and procedural history of the case. On November 20, 2016, a Portland police officer responded to a call regarding a stabbing, and the officer found Mark Whelan lying on the sidewalk at the corner of SW 3rd Avenue and SW Oak Street. Whelan had suffered multiple stab wounds on his abdomen, chest, and arm, and he was having difficulty breathing. The officer called for medical assistance, and Whelan was transported to the hospital.

Other officers arrived on the scene, and police followed a trail of blood to the intersection of SW 4th Avenue and SW Pine Street, where the Embassy Suites hotel is located. Police spoke with witnesses at the Embassy Suites,

including Julian Chavez, a hotel security guard who saw the attack, and they obtained surveillance video from the hotel's security cameras that captured the stabbing.

That hotel surveillance video shows defendant, Whelan, and Enrique Diaz entering the Embassy Suites on the night of the murder. Defendant was wearing a grey shirt with a Nike swoosh on the front, a dark-colored hooded sweatshirt, jeans, white shoes, a dark jacket that is unzipped, and a green beanie. Whelan was wearing a black coat with a light-colored zipper, carrying a plastic sack with one hand and holding a pair of tennis shoes in the other. And Diaz was wearing a dark-colored, zipped-up coat and a green and blue beanie with a pompom on the top; he was carrying a black messenger bag slung over one shoulder.

Footage from the hotel shows them together in the lobby, and it shows defendant approach the front desk. Another camera positioned near the exit doors captured them leaving the hotel about two minutes later, first Diaz, still carrying his bag, and then defendant and Whelan about 15 seconds later.

Surveillance footage from 4th Street then shows defendant walk past Chavez, the hotel security guard, and duck into an alcove. A few seconds later, Whelan appears, holding a pair of shoes in his hands, and defendant emerges from the alcove. Diaz then walks into view, still carrying the black bag, and then walks past Whelan and defendant, who are talking. Defendant gestures for Diaz to come back toward them and the three stand together for a few moments before defendant stabs Whelan multiple times; Diaz is standing near them, still with his black messenger bag over his shoulder. Whelan runs off, and defendant and Diaz walk away. Defendant and Diaz can then be seen walking together on SW Ash Street moments after the stabbing.

Diaz was arrested that night under the Burnside Bridge. Police recovered a black jacket that was protruding from his messenger bag, and they found a folding knife, which had blood on it, inside a pocket of the jacket. DNA testing would later link Whelan to the blood mixture on the knife; link Diaz to the knife handle but be inconclusive as to

whether defendant was also a contributor to the DNA mixture; and would identify defendant—and exclude Diaz—as the major contributor to DNA mixtures on both cuffs of the jacket and a blood stain inside the pocket where the knife was found.

Defendant was arrested the following day. Whelan died from his injuries six days after the stabbing, and defendant was charged with and tried for murder.

During its case-in-chief, the state introduced the video footage showing the stabbing, presented DNA evidence through a forensic scientist, and called Chavez, who testified that he saw defendant attacking Whelan. The state also called other fact witnesses and various police involved in the investigation, including Detective Clifton, who had been involved in collecting evidence to assist the forensic scientists with DNA analysis. Clifton was the state's final witness.

During his direct examination, Clifton explained that he was present when a DNA standard was collected from defendant through an oral DNA swab. Defense counsel did not ask any questions of Clifton on cross-examination. However, the court had previously explained that "this trial does allow jurors to ask questions of witnesses." Rather than release Clifton after defense counsel declined to ask questions, the court said: "Hold on, though, we do have a juror question, so I will review that with the attorneys, and then I may have a question when we come back."

The transcript reflects a two-minute sidebar after the jury passed its question to the court. The court then delivered the following question, without any objection from defendant: "And that [jury question] is: Did [defendant] give his DNA standard willingly?" Clifton answered, "No," and the prosecutor then asked a follow-up question: "Did you obtain a warrant?" Clifton responded, "Yes, we did."

Defense counsel initially said that he had no follow-up questions but a few moments later said, "Actually, Judge, I do have a question." He then proceeded to ask Clifton about whether it is typical to go through a represented defendant's lawyer, who will "just tell[] you to get a

warrant." On redirect, the prosecutor then waded further into the process of obtaining DNA samples from a defendant who has invoked the constitutional right to counsel:

"Q.   [BY PROSECUTOR] Do you recall if that's the process [(*i.e.*, asking defendant's lawyer)] that occurred on this instance?

"A.   [BY CLIFTON] I don't. I don't.

"Q.   If somebody has a lawyer, are you allowed to go and just contact them to ask them for DNA?

"A.   Yes.

"Q.   The defendant?

"A.   Well, no, if we have a search warrant. Not to question them.

"Q.   Right, but before you get the warrant, if you know that that individual's represented, are you allowed to just go and talk to them?

"A.   No."

The state then rested its case and the jury received its instructions. The jury returned a unanimous verdict finding defendant guilty of murder.

On appeal, defendant argues that the trial court plainly erred by admitting evidence that he did not willingly consent to produce incriminating evidence, which allowed the jury to draw an inference regarding his consciousness of guilt. The state, in response, does not defend the trial court's allowance of the juror question; in fact, it concedes that "the question that the jury submitted—about whether defendant had given his DNA willingly—was problematic." Instead, the state argues that, as the testimony actually developed, the "point that Clifton made was that the police had not needed consent because they had obtained a warrant to get defendant's DNA," which would not lead the jury to make prejudicial inferences about defendant *refusing*; at the very least, the state argues, it is not obvious for plain-error purposes that the jury would have drawn an impermissible inference from the testimony. The state further argues that, given the sidebar that preceded the question, it's possible that the parties stipulated to it and, regardless, defendant

was not prejudiced by any error in light of the recording of the stabbing that was played for the jury and the eyewitness testimony from someone who saw the attack.

Defendant's claim of error presents an especially stark illustration of the problems that can result from the trial practice of allowing jurors to question witnesses. *See* ORCP 58 B(9) ("With the court's consent, jurors shall be permitted to submit to the court written questions directed to witnesses or to the court. The court shall afford the parties an opportunity to object to such questions outside the presence of the jury."); ORS 136.330(1) (providing that ORCP 58 B applies in criminal trials). Oregon appears to be one of the few states whose appellate courts have not already weighed in on the risks attendant to that practice. *See generally Propriety of Jurors Asking Questions in Open Court*, 31 ALR 3d 872 (updated 2022 and originally published in 1970) (surveying practices in different jurisdictions).[1] The practice has long been a controversial one, and some courts have banned it outright because of the serious risks it poses to the adversarial process and the repeated problems those courts were seeing. *See, e.g.*, *Wharton v. State*, 734 So 2d 985, 990 (Miss 1998) ("Our prior warnings concerning juror questioning have apparently gone unheeded on occasion. Today we hold that juror interrogation is no longer to be left to the discretion of the trial court, but rather is a practice that is condemned and outright forbidden by this Court.").

Most appellate courts, however, commit the decision to the discretion of the trial court, but not without warning of the grave risks involved. For instance, in *United States v. Sutton*, 970 F2d 1001, 1005 (1st Cir 1992), the court explained:

"Allowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game

---

[1] As noted, the practice is statutorily authorized and has been mentioned in Oregon appellate cases. *Cf. McDonnell v. Premo*, 309 Or App 173, 191, 483 P3d 640 (2021) (involving a claim that post-conviction counsel provided inadequate assistance because there was "no reasonable strategic justification to agree to allow jury questions"); *Thoens v. Safeco Ins. Co. of Oregon*, 272 Or App 512, 522, 356 P3d 91 (2015) (concluding that the "answer to the juror's question was not an impermissible comment on the veracity of plaintiff, or of any other witness").

will not be worth the candle. \*\*\* [A]llowing juror-inspired questions in a criminal case is not prejudicial *per se*, but is a matter committed to the sound discretion of the trial court. \*\*\*

"We hasten to add that the practice, while not forbidden, should be employed sparingly and with great circumspection. The dynamics of a criminal trial are extremely sensitive. Innovations that carry the potential for disrupting those dynamics are risky. Juror participation in the examination of witnesses represents a significant innovation, transforming the jurors' role from a purely passive one to a partially interactive one. The practice also delays the pace of trial, creates a certain awkwardness for lawyers wishing to object to juror-inspired questions, and runs a risk of undermining litigation strategies. We suspect that, in most situations, the risks inherent in the practice will outweigh its utility. Thus, juror participation in the examination of witnesses should be the long-odds exception, not the rule."[2]

(Footnote omitted.)

This case, at minimum, confirms the need for great circumspection by trial courts in allowing jurors to craft questions for witnesses. The curiosity of jurors is frequently in tension with the rules of evidence and constitutional limitations on what evidence can be offered. The jury in this case posed a number of questions; some of them concerned unobjectionable factual clarifications, but others went directly to matters governed by constitutional protections or rules against hearsay. In addition to the question that gave rise to defendant's challenge on appeal, the jury also crafted a question—which the judge delivered—that asked

---

[2] *See also State v. Hays*, 256 Kan 48, 55, 883 P2d 1093, 1099 (1994) ("There are many risks associated with permitting jurors to ask questions of witnesses, depending upon how the trial judge handles the matter. These include: (1) Counsel may be forced to either make an objection to a question in front of the juror who asks the question, at the risk of offending the juror, or withhold the objection and permit prejudicial testimony to come in without objection; (2) jurors are unfamiliar with the rules of evidence and do not know what questions are proper; (3) juror objectivity and impartiality may be lessened or lost; (4) if a juror submits a question in open court, the other jurors are informed as to what the questioning juror is thinking, which may begin the deliberation process before the evidence is concluded and before final instructions from the court; (5) if the juror is permitted to question the witness directly, the interaction may create tension or antagonism in the juror; (6) the procedure may disrupt courtroom decorum.").

an officer, "Did you hear the victim make any statements?" The officer answered, "No," but the question treaded dangerously close to raising hearsay issues.[3]

However, this is not the case for us to decide the factors that should inform a court's decision to consent to questioning of witnesses in Oregon.[4] Regardless of other factors that should inform the practice of allowing juror questions in Oregon, a judge should never ask a question from a juror that invites a comment on a criminal defendant's constitutional right against compelled self-incrimination. *See State v. Hunt*, 297 Or App 597, 601 & n 1, 442 P3d 232 (2019) (explaining that the federal and state constitutions guarantee criminal suspects the right against compelled self-incrimination and that "[t]hose provisions prohibit the prosecution from drawing the jury's attention to the defendant's exercise of this right"); *accord State v. Banks*, 364 Or 332, 336, 342-43, 434 P3d 332 (2019) (admitting evidence of a defendant's refusal to consent to a search violates the defendant's state constitutional right against unreasonable search); *State v. Smallwood*, 277 Or 503, 505-06, 561 P2d 600, *cert den*, 434 US 849 (1977) (explaining that it is "usually reversible error to admit evidence of the exercise by a defendant of the rights which the constitution gives [the defendant] if it is done in a context whereupon inferences prejudicial to the defendant are likely to be drawn by the jury"); *United States v. Prescott*, 581 F2d 1343, 1351 (9th Cir 1978) ("If the government could use [a refusal to consent to search] against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right and future consents would not be 'freely and voluntarily given.'").

---

[3] Even if there were potentially applicable hearsay exceptions, defense counsel would have been required to interpose an objection in front of the jury that posed the question in order to litigate those issues as they arose.

[4] Judges and scholars continue to study and debate the relative benefits and risks of the practice. *See, e.g.*, Charles P. Edwards, Riquel Hafdahl, and Monica K. Miller, *Judges' Sentiment Toward Allowing Jurors to Question Witnesses: Historic and Modern Concerns*, 90 UMKC L Rev 275 (2021); Hon Thomas D. Waterman, Hon Mark W. Bennett, and Hon David C. Waterman, *A Fresh Look at Jurors Questioning Witnesses: A Review of Eighth Circuit and Iowa Appellate Precedents and an Empirical Analysis of Federal and State Trial Judges and Trial Lawyers*, 64 Drake L Rev 485 (2016).

There was little subtlety to the jury's question: It directly asked whether defendant had been willing to provide a DNA standard that could incriminate him, and the only plausible purpose for the question was to ascertain defendant's consciousness of guilt. The detective confirmed that defendant had not provided the sample willingly, and, contrary to the state's suggestion, none of the subsequent questions and testimony cured the problem created by the initial question and the detective's answer. Even if the jury understood from the testimony that defendant had not personally *refused* to provide a sample in response to a police request, the jury still learned that he had not *willingly* offered it to police, and the jury was allowed to draw an impermissible inference about consciousness of guilt from his unwillingness to provide the DNA standard despite his constitutional right to remain silent. The court should not have read the question from the jury or admitted the detective's response.

That said, this case comes to us in a plain-error posture, and "not all plain error is reversible error." *State v. Gray*, 261 Or App 121, 130, 322 P3d 1094 (2014). Rather, in the case of plain error, we must determine whether to exercise our discretion to correct it. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991). Among other considerations, we consider whether the ends of justice would be served by exercising discretion and whether the error was harmless. *Gray*, 261 Or App at 131.

Having reviewed the record in this case, we are not persuaded that it is an appropriate one in which to exercise our discretion to correct the trial court's error. As set out above, this record is unique: Surveillance video of the murder was presented to the jury in addition to eyewitness testimony and DNA evidence linking defendant to the crime. We have reviewed the surveillance video, and we see no plausible way that the jury's guilty verdict was influenced by the improper question from the jury or the resulting testimony. Accordingly, we decline to exercise our discretion to correct the error and affirm the judgment of the trial court.

Affirmed.